IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-1605

ZACHARY BOWERS,

    Plaintiff,

v.

SGT. CHARLES JOHNSON, in his individual capacity;
OFR. DEVIN MIELKE, in his individual capacity;
OFR NATHANAEL FERRARI, in his individual capacity;
OFR. JUSTIN MURPHY, in his individual capacity; and
OFR. SCOTT ALAMO, in his individual capacity;

    Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Zachary Bowers, through his attorneys Tyrone Glover, Helen Oh, and Genevieve Mesch of Tyrone Glover Law, LLC, respectfully alleges as follows:

### I.  INTRODUCTION

1. This case involves Colorado Springs Police Department (CSPD) Officers' unconstitutional arrest and tasing of Zachary Bowers during a mental health crisis. Despite knowledge of Mr. Bowers' suicidal state, officers unreasonably escalated two separate encounters with him. First at his house, where officers remained for over an hour against the family's wishes. Despite knowing that Mr. Bowers was suicidal, had consumed his wife's pills, and that probable cause for a crime was lacking, the officers unreasonably prolonged their

1

investigation, agitated Mr. Bowers repeatedly, threatened his baseless arrest, and offered no mental health assistance.

2.      After the officers finally departed, Mr. Bowers voluntarily agreed to admit himself to the hospital for medical and mental health treatment. En route to the hospital, the family briefly separated—Mrs. Bowers dropped Mr. Bowers and their fourteen-year-old son along Academy Boulevard to grab food to-go before his hospitalization, while she took their two daughters to a nearby gas station to vacuum glass fragments from their vehicle following a recent window break.

3.      Officers intercepted Mr. Bowers on Academy Boulevard as he walked on the sidewalk with his son, visibly carrying food and drink in both hands. Though Mr. Bowers was clearly unarmed and posing no threat, officers closed in on Mr. Bowers and screamed at him to get on the ground. Clutching his food and drink with both hands and unable to process the situation rationally, he fearfully screamed, "I didn't do anything!"

4.      Without warning or justification, Defendant Officer Murphy deployed his taser at Mr. Bowers, whose body locked in paralysis and crashed to the ground. Mr. Bowers cried out in agony, while his son, overcome with anguish at witnessing his dad's suffering, screamed and burst into tears.

5.      This unjustified use of force caused Mr. Bowers significant injuries, including three fractured ribs, which impaired his breathing and caused pneumonia, in addition to psychological trauma, five days of unjustified incarceration, and unjustified criminal charges.

Defendant officers violated Bowers' constitutional rights through their unlawful arrest, excessive force, and malicious prosecution.

## II.    JURISDICTION AND VENUE

6.    Jurisdiction over Plaintiff's federal claims is conferred upon this Court pursuant to 28 U.S.C. § 1331, as the claims are brought pursuant to 42 U.S.C. § 1983, in addition to the Colorado Constitution. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Jurisdiction supporting Plaintiff's claims for attorney fees and costs is conferred by 42 U.S.C. § 1988 and C.R.S. § 13-21-131.

7.    Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## III.    PARTIES

8.    At all times relevant to this Complaint, Plaintiff Zachary Bowers was a citizen of the United States and resident of the State of Colorado.

9.    At all times relevant to this Complaint, Sergeant Charles Johnson was a resident of the State of Colorado and employed as a law enforcement officer by the CSPD. At all relevant times, Defendant Johnson acted under the color of state law in his capacity as a law enforcement officer and acted within the scope of his employment.

10.    At all times relevant to this Complaint, Defendant Devin Mielke was a resident of the State of Colorado and employed as an Officer by the Colorado Springs Police Department

3

("CSPD"). At all relevant times, Defendant Mielke acted under the color of state law in his capacity as a law enforcement officer and acted within the scope of his employment.

11.     At all times relevant to this Complaint, Defendant Nathanael Ferrari was a resident of the State of Colorado and employed as an Officer by the Colorado Springs Police Department ("CSPD"). At all relevant times, Defendant Ferrari acted under the color of state law in his capacity as a law enforcement officer and acted within the scope of his employment.

12.     At all times relevant to this Complaint, Defendant Justin Murphy was a resident of the State of Colorado and employed as an Officer by the Colorado Springs Police Department ("CSPD"). At all relevant times, Defendant Murphy acted under the color of state law in his capacity as a law enforcement officer and acted within the scope of his employment.

13.     At all times relevant to this Complaint, Defendant Scott Alamo was a resident of the State of Colorado and employed as an Officer by the Colorado Springs Police Department ("CSPD"). At all relevant times, Defendant Alamo acted under the color of state law in his capacity as a law enforcement officer and acted within the scope of his employment.

## IV.     FACTUAL ALLEGATIONS

### A.  Mr. Bowers Called CSPD While He Was Having a Mental Health Crisis

14.     On the sunny morning of July 21, 2023, Plaintiff Zachary Bowers called CSPD's 911 dispatcher to report that he was being hit by his wife and that she would not stop.

15.     On the phone, Mr. Bowers' voice and tone were erratic. He was breathing heavily and struggled to communicate a cohesive sequence of events with the 911 dispatcher.

4

16.    Mr. Bowers' sixteen-year-old daughter, H.B. took over the phone conversation. She told the dispatcher that her parents had been arguing all morning and her dad threatened to kill himself.

17.    Two CSPD Officers, Defendants Devin Mielke and Nathanael Ferrari arrived at the Bowers residence around 11:40 a.m. Mrs. Bowers sat on the front porch. Mr. Bowers was inside the home.

18.    Officer Mielke spoke with Mrs. Bowers outside. Frustrated, she explained her and her husband had been arguing all morning and he locked her out of the house.

19.    Officer Mielke went inside the house to speak with Mr. Bowers. He stated his wife woke up in a terrible mood and fought with him all morning, pushing and scratching him. He explained that after telling her to stop, she slapped him. He described how he grabbed her by the shoulders and moved her outside of the house and locked the door. Mr. Bowers appeared agitated and upset by the situation.

20.    Officer Mielke asked Mr. Bowers if he or his wife had ever been arrested for any kind of domestic dispute; Mr. Bowers responded no. Mr. Bowers said the police had been there before "for mental health stuff." Officer Mielke did not inquire further.

21.    Officer Mielke exited the house and again spoke with Mrs. Bowers. She told the officers that Mr. Bowers's "mental health is so fucked up and he doesn't realize he needs help." She also acknowledged she slapped her husband earlier that day.

22.    Officers Mielke and Ferrari spoke to H.B., who was outside nearby. H.B. explained

5

the sequence of events, which aligned with Mr. Bowers's account. H.B. also said her dad took all of her mom's sleeping pills (which were actually muscle relaxants), there was an empty medicine bottle on the couch next to him, and he had been threatening to kill himself all day. The officers told H.B. they would check on Mr. Bowers.

23.    Officer Ferrari spoke to Mr. Bowers' twelve-year old daughter, S.B., who told Officer Ferrari that her dad told them to leave the house and was threatening to kill himself.

24.    The officers stood in the street quietly discussing whether there was enough to charge or arrest Mr. or Mrs. Bowers. They stated they could not conclude that Mr. Bowers was the primary aggressor.

25.    Mrs. Bowers, who was outside, told the officers that she just received an alarming text from her husband saying "goodbye."

26.    Officers Mielke and Ferrari returned to the entrance of the house and knocked on the door. Mr. Bowers shouted for them to leave. Through the door, Officer Mielke shouted, "What's with the pills?" "Did you take pills?" Mr. Bowers did not answer.

27.    Officer Mielke pounded on the front door for several minutes asking Mr. Bowers to speak with him. Agitated, Mr. Bowers shouted back repeatedly, "Just leave!" This back and forth continued for ten minutes.

28.    The officers walked to the street discussing the difficulty of determining a predominant aggressor. Not once did the officers discuss helping Mr. Bowers regarding his mental health crisis or suicidality.

29.     Mrs. Bowers walked to the front door, pounded on the door, and demanded Mr. Bowers let her in. The officers immediately followed her and told her to stop. They stated they would not let her force reentry and stood in between her and the door to prevent her from attempting to enter.

30.     Mrs. Bowers was frustrated with the challenging situation and the officers' continued and unhelpful presence. Believing her husband may commit suicide, she went to the backyard and broke the back door to let herself inside.

31.     Officer Mielke walked to the back of the house while Officer Ferrari stayed by the front door. When Officer Mielke opened the back door, Mrs. Bowers told him to leave and that he did not have permission to be there. Officer Mielke closed the door and asked Mrs. Bowers to talk to him outside. She repeatedly told him to leave.

32.     Officer Mielke reunited with Officer Ferrari at the front of the house. They stood together silently and listened, as they could hear the couple through the wall. They heard Mrs. Bowers crying in sadness, telling Mr. Bowers to unlock the door to the room he was in. Mr. Bowers shouted back that he would not. Mrs. Bowers asked again that he open the door. Mr. Bowers responded, "why?" They continued back and forth.

33.     The officers stood quietly and listened as the couple conversed. While their tone and dialogue reflected emotional struggle, Mr. and Mrs. Bowers were working through their conflict and navigating a difficult moment, without any threats or indication of violence or danger.

7

34.    After listening for several minutes, Officers Mielke and Ferrari discussed how they did not believe there was enough to charge Mr. or Mrs. Bowers because there was no single offender and the couple chose to remain in the house together.

35.    It was apparent the situation was resolving and there was no further justification for the officers to engage with Mr. Bowers, except to provide potential mental health assistance, but this was never offered or discussed.

36.    At this time, the officers had been at the Bowers residence for an hour.

**B.   Despite the Lack of Probable Cause, the Officers Escalated the Situation and Threatened Mr. Bowers' Arrest Without Justification**

37.    CSPD Sergeant Charles Johnson then arrived at the residence.

38.    Officers Mielke and Ferrari explained the situation and arguments between the couple, how the daughters told them that Mr. Bowers consumed his wife's pills, and Mrs. Bowers' worry that Mr. Bowers might hurt himself after he sent a concerning goodbye message to her.

39.    Officer Mielke told Sergeant Johnson that they did not believe they had probable cause to make an arrest for either Mr. or Mrs. Bowers and they were deciding whether to leave altogether.

40.    While the officers conversed, Mr. Bowers opened the door and stated, "I'm fine, you guys can go now," closing the door. Officer Mielke responded, "All we want to do is talk, Zach." Mr. Bowers responded, "I already talked!"

41.    The officers discussed amongst themselves the weaknesses in making an arrest. They made no mention of how to help Mr. Bowers' mental health crisis or address his suicidality.

8

42.     Sergeant Johnson walked to the front door, knocked, and asked Mr. Bowers through the door, "How can I help resolve all of this?" Mr. Bowers responded from inside, "Leave me alone! I just want to lay down." Sergeant Johnson responded, "That's perfect, but how can I resolve this whole family issue?" Mr. Bowers responded, "I'm laying down, just leave me alone."

43.     Sergeant Johnson tried to coax Mr. Bowers to come outside for several minutes. Mr. Bowers grew increasingly agitated as he repeatedly asked the officers to leave.

44.     Sergeant Johnson walked to the back of the house alone and could hear Mr. and Mrs. Bowers arguing inside, attempting to resolve their issues. Sergeant Johnson knocked on the back door and Mrs. Bowers immediately told him to leave. Sergeant Johnson stated he was trying to resolve the situation. Extremely annoyed because the officers were hindering their ability to do just that, Mrs. Bowers shouted for him to leave and confirmed that no one was going to get hurt. Sergeant Johnson knocked again, to which Mrs. Bowers repeatedly shouted, "Fucking go!" to no avail. Sergeant Johnson continued knocking and asked, "what can I do to help, besides leaving?" Extremely frustrated, Mrs. Bowers yelled, "Just go!"

45.     Meanwhile, Officers Mielke and Ferrari stood by the front door. Officer Mielke knocked on the front door repeatedly.

46.     Agitated and unable to function reasonably, Mr. Bowers opened the door and shouted, "I asked you to make her leave!" "I told you guys to fucking leave!" Mr. Bowers walked through the living room and into the kitchen area, leaving the front door open. He shouted, "look at this! I'm sitting here watching TV!" Officers Mielke and Ferrari entered the house. Mr. Bowers

9

shouted that he asked for Mrs. Bowers to leave the house. In frustration, he walked downstairs

to be alone in another room. Mrs. Bowers was in the bathroom.

47.     With nothing further to see, Officers Mielke and Ferrari exited the house, leaving

the front door open. Sergeant Johnson joined them.

48.     Mr. Bowers returned to the front door. In a tone conveying distress and sadness,

he pleaded with the officers to leave because they were making things worse.

49.     The officers discussed how to proceed. Officer Mielke stated that Mrs. Bowers

wanted to be in the house with Mr. Bowers and that no one was in danger. He stated the plan

now was to walk away.

50.     At no point did the officers discuss any concern for the safety or well-being of Mr.

Bowers considering his suicidality.

51.     Despite the situation appearing to resolve and the lack of probable cause to arrest

Mr. Bowers, Sergeant Johnson knocked on the front door and stated the officers were going to

obtain a warrant for Mr. Bowers' arrest.

52.     Mr. Bowers returned to the door and opened it, shouting, "I need you guys to go,

she destroyed the back door, now she's back. What the fuck was the point of all of this? Fucking

go!" He slammed the door.

53.     Sergeant Johnson shouted through the door that they were going to arrest Mr.

Bowers and apply for a warrant.

54.     Extremely distressed, Mr. Bowers opened the door screaming, "What the fuck?!

What are you going to arrest me for?" He slammed the door as Sergeant Johnson responded, "harassment."

55. Pushing him deeper into crisis, Mr. Bowers opened the door bellowing, asking the officers to explain how he was under arrest for harassment in his own house. He slammed the door. Behind the door, the officers could hear Mr. Bowers screaming to himself in overwhelm, "I'm under arrest?! I'm under arrest?!"

56. Mr. Bowers opened the door, stood in the doorway and screamed, "You want to kill me? Go ahead, I want to die!" Mr. Bowers slammed the door shut and continued to scream to himself.

57. The officers knew that Mr. Bowers was suicidal and mentally dysregulated. Despite this knowledge, the officers disregarded this concern completely and continued to escalate the situation and threaten his arrest.

58. Mr. Bowers opened the front door and screamed to the officers in distress, "You want to kill me?" "Go ahead and shoot me! Go ahead!" Mr. Bowers stood in the doorway holding a miniature toy axe in one hand pointed downward by his leg. Closest to Mr. Bowers was Officer Mielke, who stood calmly in place and told Mr. Bowers, "I don't [want to kill you]." Mr. Bowers repeatedly screamed for them to kill him as he closed the door.

59. Officers Mielke, Ferrari, and Johnson stood on the front lawn. They could hear Mr. Bowers continuing to scream in emotional turmoil inside.

60. The officers relocated to the street and stood around for five minutes. During this

time, Sergeant Johnson requested TAC (tactical) support to arrest Mr. Bowers.

61.    Officers Mielke and Ferrari stood by, listened, and did nothing to object to the unsupported arrest or unnecessary escalation.

62.    Mrs. Bowers exited the house to re-park her vehicle on the street, near where Sergeant Johnson and Officer Mielke were standing. The officers watched her as she audibly muttered her frustration with the officers, their lack of helpfulness, and how they made the situation worse.

63.    As she walked back to the house after parking her car, Sergeant Johnson asked, "Just so I'm clear, you feel safe inside and you don't need us here?" Mrs. Bowers looked at the Sergeant and sternly replied, "We don't need you here" and "I feel safe inside."

64.    Officers Mielke, Ferrari, and Johnson finally left the Bowers residence.

65.    At no point did the officers request a Community Response Team (CRT), which is a multi-disciplinary team offered through the CSPD designed to assist members of the community who are in acute crisis due to mental health related situations.

66.    Mrs. Bowers learned that Mr. Bowers had taken all her muscle relaxers. Until this point, while visibly agitated and distressed, Mr. Bowers remained physically functional and communicative, as the sedative effects had not yet manifested. Having experienced her husband's suicidality previously—this being his fourth suicide attempt in recent years—Mrs. Bowers tried to help Mr. Bowers vomit and expel the pills, but was not successful.

67.    At this point, Mr. Bowers agreed to seek medical help at the pleading of Mrs.

12

Bowers. He voluntarily joined Mrs. Bowers and their children to admit himself to Memorial Hospital for treatment.

68.    Concerned for her father's safety and how things devolved, H.B. called the 911 dispatcher to inform them that Mr. Bowers took all of Mrs. Bowers muscle relaxers and Mrs. Bowers was going to take Mr. Bowers to the emergency room to get help.

69.    H.B. also told the 911 dispatcher that Mr. Bowers was not violent and had no weapons. She explained that Mr. Bowers had grabbed a toy from her brother's room, he never had a real weapon, and did not pose a risk of harm to the officers.

70.    The 911 dispatcher told H.B. that paramedics were headed to their location and were made aware of the incident and his potential overdose.

## C. Defendants Pursued Mr. Bowers to Arrest Him Without Probable Cause, While Using Unreasonable Force Against Him in His State of Mental Crisis

71.    Based on his previous hospitalizations, Mr. Bowers expected to be placed on an emergency mental health hold, during which he typically received inpatient treatment for 30-90 days.

72.    Mr. Bowers expressed that he was hungry and wanted food before going to the hospital. Recognizing the importance of keeping him agreeable to receiving treatment, Mrs. Bowers agreed. She dropped her husband and their fourteen-year-old son, L.B, off at the intersection of Academy Boulevard and Palmer Park Boulevard to get fast food before continuing the drive to the hospital. Meanwhile, Mrs. Bowers and their two other children went to the nearest gas station so she could quickly vacuum their vehicle, as one of the car windows was

13

recently broken and glass fragments remained inside.

73.    Mr. Bowers and his son ordered their food to-go. Mr. Bowers walked with a drink in his left hand and a bag of food in his right hand. They walked South along the sidewalk on Academy Boulevard to reunite with Mrs. Bowers. Academy Boulevard was to Mr. Bowers' left, and a large empty parking lot with a drive through was to his right.

74.    CSPD officers were informed by dispatch that Mr. Bowers was heading to Memorial Hospital.

75.    The officers tracked Mr. Bowers' movements and spotted him on Academy Boulevard with L.B.

76.    Officer Joseph Martens parked his police vehicle in the middle of the entrance to the parking lot behind Mr. Bowers and L.B.

77.    Officer Martens exited his car and followed Mr. Bowers on foot down the sidewalk. From roughly fifteen feet behind Mr. Bowers, Martens shouted at him to stop walking.

78.    Clutching his bag of food and drink in his hands, Mr. Bowers fearfully shouted, "I didn't do anything!" as he continued walking forward, away from Officer Martens. Officer Martens followed Mr. Bowers in walking-stride down Academy Boulevard.

79.    Mr. Bowers was not told he was under arrest.

80.    To Mr. Bowers' right was a two-foot-tall brick wall running parallel to the sidewalk, separating the sidewalk from the restaurants.

81.    Defendant Officers Justin Murphy and Scott Alamo arrived in two separate police

14

vehicles. Officer Alamo parked his vehicle on Academy Boulevard and positioned himself between Mr. Bowers and Academy Boulevard. Officer Murphy parked his vehicle on Academy Boulevard slightly ahead of Mr. Bowers' path to block his forward progress.

82.     The officers closed in on Mr. Bowers from all sides.

83.     It was visible to the officers that Mr. Bowers was unarmed and posed no threat of harm to law enforcement officers or others. Both of his hands were full of food and drink.

84.     Defendant Murphy positioned himself in front of Mr. Bowers and immediately screamed at him to get on the ground while drawing his taser.

85.     Appearing disoriented, distraught, and unable to process the situation rationally, Mr. Bowers clutched his food and drink as he shouted fearfully and repeatedly, "I didn't do anything! I didn't do anything! I didn't do anything!"

86.     Mr. Bowers nervously walked forward. Using one hand, Defendant Murphy pushed Mr. Bowers backwards and deployed his taser without warning.

87.     Mr. Bowers let out an agonized cry as his body locked in rigid paralysis. He crashed to the ground – with his food and drink still in his hands – with the left side of his body slamming against the sidewalk. Mr. Bowers fractured three ribs on his left side as a result.

88.     Defendant Alamo quickly pinned Mr. Bowers face-down on the ground and placed him in handcuffs and under arrest. Mr. Bowers remained laying on the ground on his side. Screaming and sobbing, Mr. Bowers repeatedly cried, "Why?!"

89.     L.B. screamed in anguish after witnessing Defendants tase his father. L.B. begged

15

the officers to explain why they tased him.

90.     At least seven other CSPD officers arrived on scene.

91.     While laying on the ground, Mr. Bowers burped and vomited.

92.     Officers positioned Mr. Bowers so he could sit upright.

93.     Mrs. Bowers and her two teenage daughters arrived and saw Mr. Bowers on the ground, surrounded by law enforcement officers, screaming in distress. Officers immediately detained Mrs. Bowers and placed her in a police vehicle. Sobbing, the children stood on the sidewalk at a distance with another police officer.

94.     Mr. Bowers was unsteady, swaying, and unable to remain upright. Officer Muphy stood behind Mr. Bowers and held him upright.

95.     Emergency responders arrived to examine Mr. Bowers. Defendant Murphy told the paramedics, "we have some information that [Mr. Bowers] took a large amount of pills earlier."

96.     Mr. Bowers began to drift in and out of consciousness. Each time he came to, he erupted in distress and confusion.

97.     At the direction of Sergeant Johnson, Mr. Bowers was transported to Penrose Hospital for medical clearance to then be admitted to the jail.

98.     At Penrose, Mr. Bowers was shackled to the hospital bed. He wavered in between periods of conscious distress and sleep. During his moments of consciousness, he wailed that he was in pain and struggled to comprehend what was happening. He repeatedly asked why he was

under arrest and at the hospital.

99.    Two hours later, Physician Gregory J. Haubrich, PAC, cleared Mr. Bowers to be transferred to the El Paso County Jail and placed on suicide watch.

100.    Instead of receiving the mental health treatment that Mr. Bowers was voluntarily on his way to receive, he was jailed and criminally prosecuted. Defendants deprived him of necessary psychiatric care during an acute mental health crisis while he also suffered from rib fractures and developing pneumonia that would go undiagnosed and untreated for days.

**D.  Mr. Bowers Experienced Worsening Pain and Physical Illness, Spent Five Days Iin Jail, and Faced Excessive and Unsupported Criminal Charges**

101.    Still struggling to function, stay awake, or comprehend what was happening, Mr. Bowers was booked at the jail and charged in two separate cases: 23CR2970 and 23CR2971.

102.    In 23CR2971, Mr. Bowers was charged with the following crimes from his encounter with the police at his house:

a.  C.R.S. 18-3-206 Menacing – Deadly Weapon, Felony in the Fifth Degree (Domestic);

b.  C.R.S. 18-9-11 Harassment, Misdemeanor in the First Degree (Domestic); and

c.  C.R.S. 18-6-401 Child Abuse – Without Injury/Knowing or Reckless, Misdemeanor in the Second Degree (Domestic) (two counts).

103.    In 23CR2970, Mr. Bowers was charged with the following crimes from his encounter with the police on Academy Boulevard:

a.  C.R.S. 18-3-203 Assault in the Second Degree against a Peace Officer, Felony in the

17

Fourth Degree;

b.  C.R.S. 18-8-103 Resisting Arrest, Misdemeanor in the Second Degree; and

c.  C.R.S. 18-8-104 Obstructing a Peace Officer, Misdemeanor in the Second Degree.

104.    Mr. Bowers cycled in and out of consciousness at the jail. His waking periods were fraught with confusion and suffering. He made numerous suicidal statements and attempted to hit himself with his fists. He was transferred to Medical Observation Housing for his continued chest pain and difficulty breathing.

105.    After five days in custody, on July 26, 2023, Mrs. Bowers paid a $3,000 bond for Mr. Bowers' release.

106.    Mr. Bowers was highly traumatized and experienced ongoing pain in his left rib with difficulty breathing.

107.    On July 29, 2023, Mr. Bowers went to UC Health Urgent Care, where he was diagnosed with a rib contusion and left lower lobe pneumonia. He was prescribed antibiotics.

108.    The pain in his ribs persisted and he continued to have difficulty breathing. On August 3, 2023, Mr. Bowers went to the emergency department at UC Health. After performing a CT scan of his chest, Mr. Bowers was diagnosed with fractures to ribs 6, 7, and 8 on his left side.

109.    Pneumonia is a known risk following rib fractures. This is due to the pain from rib fractures being worsened by deep breathing or coughing, which is compensated with shallow breathing or coughing. This inability to clear the lungs leads to increased mucus buildup and risk

of infection, increasing the risk of pneumonia.

110.    For the first three months, he had difficulty breathing and was not able to lift his left arm. His injured ribs took about six months to heal completely.

111.    In addition to his physical suffering, for a year and three months, Mr. Bowers defended against numerous, serious, and unsupported criminal charges in two separate cases, causing him significant stress and anxiety. Mr. Bowers was set for a jury trial in both cases.

112.    On May 20, 2024 – the morning of trial in 23CR2971 – the prosecutor on her own accord dismissed the charges of child abuse and harassment. Mr. Bowers, represented by a public defender, proceeded to trial for the charge of Menacing with a Deadly Weapon.

113.    Defendants Ferrari, Mielke, and Johnson testified at trial. In their testimony, they stated they knew that Mr. Bowers was suicidal and having a mental health crisis. They also confirmed that Mr. Bowers never made threats of violence against them. Further, they confirmed that before Sergeant Johnson arrived, Officers Mielke and Ferrari were considering leaving altogether because the grounds for an arrest were weak.

114.    The defense called Mrs. Bowers as a witness. In her testimony, she described how Sergeant Johnson's threats of arrest escalated Mr. Bowers' mental state and made him frantic. She stated it did not seem like anything was done to help her husband, nor was medical attention called for him.

115.    After a two-day trial, Mr. Bowers was acquitted.

116.    In 23CR2970, Mr. Bowers accepted a plea agreement, pleading guilty to

obstructing a peace officer with the dismissal of the remaining charges. At the plea hearing, the stated factual basis for the charge was from Mr. Bowers' falling backwards into an officer after he was arrested and in handcuffs.

117.   As a direct result of Defendants' actions, Mr. Bowers experienced significant physical, psychological, and emotional pain and suffering.

118.   Mr. Bowers' pneumonia and fractured ribs were the direct result of Defendants' unnecessary and excessive tasing.

119.   In addition to his prolonged physical injuries, he suffers PTSD from the incident and sees his psychiatrist monthly. He also started a new therapy program one week before his trial date, as he was having significant anxiety about his criminal cases.

120.   Mr. Bowers and his family, including his children, now fear interacting with the police.

121.   Mr. Bowers' son, L.B., suffered extreme emotional distress from watching his father being tased during his state of mental crisis.

122.   The actions of Defendants were excessive, objectively unreasonable, and disproportionate under the circumstances.

123.   The acts described herein were done by Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or reckless disregard for Mr. Bowers' constitutionally protected rights.

124.   The acts or omissions of Defendants were the moving force behind, and the

20

proximate cause of, the injuries sustained by Plaintiff.

## V.    STATEMENT OF CLAIMS FOR RELIEF

### CLAIM 1
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 7 — Excessive Force
### (Against Defendant Murphy)

125.    Plaintiff incorporates all other paragraphs of this Complaint by reference as if fully set forth herein.

126.    Defendant Murphy acted under color of state law and within the course and scope of his employment as a law enforcement officer at all times relevant to the allegations in this Complaint.

127.    At all relevant times, Defendant Murphy was a "peace officer" under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

128.    Plaintiff had a protected interest under Colorado Constitution, article II, § 7 in being free from unreasonable seizures through the use of excessive force by law enforcement personnel.

129.    Defendant Murphy seized Plaintiff by means of unreasonable and excessive physical force, including but not limited to the use of a taser.

130.    Defendant Murphy had no reasonable basis to believe Plaintiff posed a threat of harm, immediate or otherwise, to Defendant or anyone else.

131.    Plaintiff was not committing nor suspected of committing a violent offense.

132.    Plaintiff was not given a warning regarding the imminent use of a taser on him.

21

133.    Plaintiff's evading was minimal and did not support the level of force used against him.

134.    Defendant Murphy and each of the responding officers knew that Mr. Bowers was having an acute mental health crisis.

135.    Defendant Murphy did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances.

136.    Defendant Murphy used more force than was reasonably necessary to arrest or gain control of Plaintiff.

137.    Defendant's use of force against Plaintiff, as described herein, was objectively unreasonable in light of the circumstances confronting him before and during the encounter with Plaintiff.

138.    Defendant did not act upon a good faith and reasonable belief that his actions in using unreasonable and excessive force against Plaintiff were lawful.

139.    The acts or omissions of Defendant was moving force behind, and the proximate cause of, injuries sustained by Plaintiff.

140.    Defendant's acts and omissions described herein were done intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. Bowers' constitutionally protected rights.

CLAIM 2
42 U.S.C. § 1983
Fourth Amendment - Excessive Force
(Against Defendant Murphy)

22

141. Plaintiff incorporates all other paragraphs of this Complaint by reference as if fully set forth herein.

142. Defendant Murphy acted under color of state law and within the course and scope of his employment as a law enforcement officer at all times relevant to the allegations in this Complaint.

143. At the time when Plaintiff was seized, he had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

144. Any reasonable law enforcement officer knew or should have known of this clearly established right.

145. Defendant Murphy seized Plaintiff by means of unreasonable and excessive physical force, including but not limited to the use of a taser.

146. Defendant Murphy had no reasonable basis to believe Plaintiff posed a threat of harm, immediate or otherwise, to Defendant or anyone else.

147. Plaintiff was not committing nor suspected of committing a violent offense.

148. Plaintiff was not given a warning regarding the imminent use of a taser on him.

149. Plaintiff's evading was minimal and did not support the level of force used against him.

150. Defendant Murphy and each of the responding officers knew that Mr. Bowers was having an acute mental health crisis.

151. Defendant did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances.

152. Defendant Murphy used more force than was reasonably necessary to arrest or gain control of Plaintiff.

153. Defendant's use of force against Plaintiff, as described herein, was objectively unreasonable in light of the circumstances confronting him before and during the encounter with Plaintiff.

154. Defendant did not act upon a good faith and reasonable belief that his actions in using unreasonable and excessive force against Plaintiff were lawful.

155. The acts or omissions of Defendants were moving force behind, and the proximate cause of, injuries sustained by Plaintiff.

156. Defendants' acts and omissions described herein were done intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. Bowers' constitutionally protected rights.

**CLAIM 3**
C.R.S. § 13-21-131
Unlawful Arrest – Colo. Const. Art. II, § 7
(Against Defendants Mielke, Ferrari, Johnson, Alamo)

157. Plaintiff incorporates all other paragraphs of this Complaint by reference as if fully set forth herein.

158. At all relevant times, Defendants acted under color of state law and within the

24

course and scope of their employment as a law enforcement officers.

159. At all relevant times, Defendants were "peace officers" under Colo. Rev. Stat. § 24-31-901(3) employed by a local government.

160. At all relevant times, Defendants acted under color of state law when they seized Plaintiff or caused his seizure and placed him under arrest.

161. Defendants knew Mr. Bowers was suffering from an acute mental health crisis.

162. Defendants knew they lacked probable cause to arrest Mr. Bowers, yet repeatedly provoked and agitated him in an attempt to procure any evidence of a crime.

163. Defendants knew they lacked probable cause to arrest Mr. Bowers, yet they nonetheless told Mr. Bowers they would get a warrant for his arrest and contacted and supported additional officers to effectuate his arrest.

164. Defendants Mielke, Ferrari, and Johnson caused Mr. Bowers' arrest, which was effectuated by Defendant Alamo.

165. Defendants' arrest of Plaintiff was unsupported by probable cause that Plaintiff was committing or had committed any crime.

166. Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

167. As a direct and proximate result of said unlawful detention in disregard of Plaintiff's constitutional rights, Plaintiff has suffered significant damages.

<u>CLAIM 4</u>
42 U.S.C. § 1983

25

## Unlawful Arrest – Fourth Amendment
### (Against Defendants Mielke, Ferrari, Johnson, Alamo)

168.    Plaintiff incorporates all other paragraphs of this Complaint by reference as if fully set forth herein.

169.    At all relevant times, Defendants acted under color of state law and within the course and scope of their employment as a law enforcement officers.

170.    At the time when Plaintiff was seized, he had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable arrests without probable cause.

171.    Any reasonable law enforcement officer knew or should have known of this clearly established right.

172.    Defendants knew Mr. Bowers was suffering from an acute mental health crisis.

173.    Defendants knew they lacked probable cause to arrest Mr. Bowers, yet repeatedly provoked and agitated him in an attempt to procure any evidence of a crime.

174.    Defendants Mielke, Ferrari, and Johnson caused Mr. Bowers' arrest, which was effectuated by Defendant Alamo.

175.    Defendants' arrest of Plaintiff was unsupported by probable cause that Plaintiff was committing or had committed any crime.

176.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

26

177.    As a direct and proximate result of said unlawful detention in disregard of Plaintiff's constitutional rights, Plaintiff has suffered significant damages.

### CLAIM 5
### 42 U.S.C. § 1983
### Fourth Amendment - Malicious Prosecution
### (Against Defendants Johnson, Mielke, Ferrari)

178.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

179.    At all relevant times, Defendants acted under color of state law and within the course and scope of their employment as a law enforcement officers.

180.    Defendants Johnson, Mielke, and Ferrari did not have a reasonable basis or probable cause to believe that Plaintiff was committing a crime.

181.    Defendants knew Mr. Bowers was suffering from an acute mental health crisis.

182.    Defendants Murphy, Mielke, and Ferrari knew they lacked probable cause to arrest Mr. Bowers, yet repeatedly provoked and agitated him in an attempt to procure any evidence of a crime.

183.    Defendants knew they lacked probable cause to arrest Mr. Bowers, yet they nonetheless told Mr. Bowers they would get a warrant for his arrest and contacted and supported additional officers to effectuate his arrest.

184.    Defendants' arrest of Plaintiff was unsupported by probable cause that Plaintiff was committing or had committed any crime.

27

185.    Defendants, acting without probable cause, procured numerous groundless charges against Plaintiff in order to maliciously bring about Plaintiff's criminal prosecution, including charges of felony menacing with a weapon, child abuse, harassment, assault against a peace officer, and resisting arrest.

186.    Defendants, acting knowingly, maliciously, willfully and wantonly participated in the institution of legal proceedings against Plaintiff, including promoting the continued criminal prosecution of Plaintiff with knowledge that there were no reasonable grounds to believe that Plaintiff had committed the above crimes.

187.    Defendants acted knowingly, maliciously, willfully and wantonly by repeatedly provoking Plaintiff and telling him he was going to be arrested, despite a lack of probable cause.

188.    Plaintiff spent five days incarcerated before he was released after paying a bond of $3,000.

189.    In 23CR2971 – after defending his case for ten months, the prosecutor dismissed the charges of child abuse and harassment, and Mr. Bowers was acquitted on the charge of Menacing with a Deadly Weapon. In 23CR2970, the prosecutor dismissed the charges of assault on a peace officer and resisting arrest as part of a plea agreement.

190.    Plaintiff defended against these charges for a total of fifteen months.

191.    Defendants were motivated by an improper purpose to punish Plaintiff for opposing their unlawful conduct, in an effort to divert attention from their own misconduct and to insulate themselves from civil liability.

28

192.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer significant damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant:

(a)    Appropriate declaratory and other injunctive and/or equitable relief;

(b)    Compensatory and consequential damages, including damages for physical injury, emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)    All economic losses on all claims allowed by law;

(d)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)    Attorney's fees and the costs associated with this action, as well as expert witness fees, on all claims allowed by law;

(f)    Pre- and post-judgment interest at the lawful rate to the maximum extent allowed by law; and

(g)    Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 21st day of May 2025.

Tyrone Glover Law, LLC

*s/ A. Tyrone Glover*
A. Tyrone Glover
Helen Oh
Genevieve Mesch
2590 Walnut Street
Denver, CO 80205
303-577-1655
tyrone@tyroneglover.com
helen@tyroneglover.com
genevieve@tyroneglover.com

30